Opelousas-St. Landry Securities Company, Inc. v. Commissioner.
Opelousas-St. Landry Sec. Co. v. Commissioner
Docket No. 49459.
United States Tax Court
T.C. Memo 1955-240; 1955 Tax Ct. Memo LEXIS 98; 14 T.C.M. (CCH) 961; T.C.M. (RIA) 55240; August 30, 1955
Isom J. Guillory, Sr., Esq., Box 151, Eunice, La., and Isom J. Guillory, Jr., Esq., for the petitioner. Jackson L. Bailey, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for the calendar year 1949 in the amount of $723.72. The only issue is whether petitioner realized ordinary income or long-term capital gains from the sale of certain real estate during 1949. Findings of Fact Petitioner was incorporated on June 24, 1925 under the laws of Louisiana. Its return for 1949 was filed with the collector of internal revenue for the district of Louisiana. Its *99 returns are filed and books kept on the basis of cash receipts and disbursements. Capital stock of petitioner consists of 1,200 shares of preferred stock, par value $100, and 8,000 shares of common stock, par value $10. Each of petitioner's fourteen directors owns one share of common stock, endorsed in blank and in custody of the St. Landry Bank & Trust Company, hereafter referred to as the bank. The remaining 7,986 shares of common, and all the preferred stock are held in the name of Allen Dezauche as trustee for the bank. Dezauche is one of the fourteen directors of petitioner and is president of the bank as well as of petitioner. All the directors of petitioner are directors of the bank except for the cashier of the bank who is not a director of the bank. The same persons serve as officers of petitioner and of the bank. Board meetings for the bank and for petitioner are held jointly. The State Banking Department and the Federal Deposit Insurance Corporation examined petitioner's real estate holdings in their periodic audits of the bank, and commented thereon in their reports to the bank. Louisiana statutes (Acts 1902, No. 45, sec. 1) allowed banks to hold real estate acquired *100 by certain specified means for no longer than 10 years. An amending act (Acts 1924, No. 229, sec. 3) reduced the limitation on such holdings to 5 years. The bank held an accumulation of real estate acquired on foreclosure or in satisfaction of loans, or by other means specified in the Acts of 1902 and 1924. Prospects were that real estate holdings would increase due to depressed business conditions. The poor real estate market precluded selling off the real estate holdings. Petitioner was organized to enable the bank to comply with the amended statute without financial injury. Petitioner's charter sets forth numerous permissible activities including "To buy, sell and deal in, for its own account and * * * or as agent or broker, real estate, * * *." On its return for 1949, it characterizes its principal activity as "Realty Holding." From 1925 to 1954, petitioner acquired more than 400 tracts of land, amounting to about 15,000 acres. Petitioner's real estate holdings ranged from a high of $482,112.41 in 1933 to a low of $164,435.95 in 1951. On December 31, 1949, the real estate account showed a balance of $175,985.95. The bank had loans on all land acquired from it. Sometimes the *101 land itself was transferred from the bank. Sometimes the note was transferred to petitioner, which foreclosed. Two land acquisitions were made by purchase from other than the bank. One was a strip 30 by 1,000 feet to be used as a road to make petitioner's other property accessible. The other was 30 acres scattered throughout a 450-acre tract previously acquired by petitioner. This purchase was to prevent trespassing from the scattered plots. Cost of these outside purchases aggregated about $2,000. Petitioner attempted to derive income from the lands it held. Farm land was farmed, town property rented, timber sold from woodlands, oil and mineral lands leased. Land was sold when an advantageous offer was received. A large amount of land was sold pursuant to such offers. The land in controversy was part of the John Hidalgo farm. The farm was acquired by the bank for debt on July 25, 1932 and transferred to petitioner on August 8, 1932 along with two other tracts of land. The land was under cultivation then and continued to be operated entirely as a farm until 1945. The property contained a 7- or 8-room farmhouse and two or three cabin type residences. During the years from 1932 to *102 1945, parcels from the farm were sold reducing the acreage from 188 acres to about 65 acres. By 1945, the town of Opelousas, Louisiana, had grown to within a short distance of the farm. Directors of petitioner considered it advantageous to subdivide part of the land. Eighteen acres of the land were surveyed and platted. The St. Landry Subdivision, consisting of 59 lots, came into being. The remainder of the tract is still farmed. Petitioner spent $16,195.67 on improving and developing the subdivision. Streets were laid and graded, a water main and some extensions installed, an electric line built, and a gas line installed. Restrictions were set as to race and character of prospective residents, and as to type and cost of dwellings to be built. Petitioner constructed a house on one of the lots. This house was to be representative of the type petitioner hoped to have erected on the property. The house was rented for about 1 year and then sold during 1949 along with its lot. A sign, 4 by 6 feet, was erected on the subdivision in an earlier year bearing words to the effect: "St. Landry Subdivision - Apply at St. Landry Bank & Trust Company." The sign was broken down by a storm several *103 months later and never replaced. No sign was displayed during 1949. Aside from that one sign, no advertising was used by petitioner. Petitioner had no license to act as a broker nor did it hire any salesmen. It never listed any lots with a real estate dealer. All sales were made to people who applied at the bank. Sales were refused to certain persons who did not conform to character standards set by petitioner. It had no office separate from the bank, and had no listing in the telephone directory or in the business directory for Opelousas. All sales were made by petitioner's president at his desk at the bank. It was a matter of general knowledge in the neighborhood that the bank was the place to inquire about these lots. The real estate market in Opelousas during the years 1946 to 1953 was favorable. The public was not aware of the existence of petitioner nor were inquiring persons advised as to the real owner except in connection with actual sales. Sales have been made in the subdivision as follows: Number
Year
of Sales
Lots Sold
1946
3
5
1947
1
2
1948
2
3
1949
7
10
1950
7
8
1951
1
1
1952
2
2
1953
6
8 Profit on 1949 sales totaled *104 $5,567.09 which petitioner reported as long-term capital gain. In its return for 1949, petitioner reported income from interest of $1,925.99; rents, $80,306.21; royalties, $23,319.81; livestock, $50; and capital gain from sales of real estate as follows: Sale
Profit on
Total
Price
Cost
Sale of Lots
Profit
$ 2,800.00
$ 1,050.00
$1,750.00
8,500.00
7,532.91
967.09
850.00
350.00
500.00
650.00
350.00
300.00
1,800.00
700.00
1,100.00
1,000.00
350.00
650.00
650.00
350.00
300.00
$ 5,567.09
126.35
126.35
322.60
322.60
5,487.00
5,487.00
2,298.75
2,298.75
5,420.62
5,420.62
120.00
120.00
2,000.00
2,000.00
162.00
162.00
496.40
496.40
$32,683.72
$10,682.91
$22,000.81 Included in the capital gain was the profit from the 10 lots sold in "St. Landry Subdivision." Petitioner reported ordinary net income of $50,236.23 for the year 1949. During 1949, petitioner sold lots which were held by it primarily for sale to customers in the ordinary course of its business. Opinion We are once more confronted with the familiar question whether property acquired, subdivided, developed and sold is *105 the source of ordinary income. Under the present circumstances we think it is. Petitioner was organized as a business corporation. It was created to acquire and make money out of the real property it owned. . Unlike such cases as , it did not intend to develop these parcels for rent, and the only means it had for making a profit was to sell them. This it did, employing the method apparently considered most appropriate for that purpose. It undertook the activity of subdividing, improving, and displaying its property, presumably in the manner and with the purpose of making the transactions as profitable as possible. See . It had no need of an advertising or selling campaign since the evidence shows that those in the neighborhood knew the property and were aware how to make inquiries concerning it. Had the bank itself retained these lots it is possible that its liquidation of forced acquisitions might bring it within the doctrine of such cases as . But petitioner was organized *106 for the very reason that it could do what the bank could not. Its separate existence, activity and purpose may not be ignored. . And it cannot be said here, as it was in the Kanawha Valley case (at p. 256) that "We think it unreasonable to conclude that petitioner, forbidden by state law to carry on a real estate business, was actually engaged in that business and selling real estate to customers in the regular course thereof, merely because it had acquired and sold three parcels of real estate over a period of two years * * * incident to the collection or recovery of money loaned by it in the transaction of its regular banking business. * * *" The fact that lots were not sold repreatedly to the same persons does not exclude the actual purchasers from the class of "customers." Under the circumstances, anyone who bought from petitioner was its customer. . While the sales might have been more frequent, their continuity, as shown by our findings, cannot be questioned. And it would be difficult to say that transactions involving 10 lots in the year in issue and *107 8 in the following constituted such an infrequency of dealings as to overcome all the other factors. Cf., e.g., We consequently dispose of the issue of fact, as set forth in our findings, in accordance with respondent's determination. Decision will be entered for the respondent.